I haven't had this experience with council on zoom while I'm in a courtroom that literally I don't think has ever happened to me. So this is, I guess, exciting. I don't know. But we see councils present. We're up here. And you can't turn sideways on the camera to point at each other. That wouldn't be nice. But we will proceed. And, of course, wonderful to have you both here. I hope you and your families are safe. So, obviously, we are here on the Massey v. SCI case. And let's, in the first instance, hear from appellant, please. May I please have the court? My name is Craig Cooley. I represent Jay Kwon Massey. And we're before the court today on two issues. One is an issue of first impression. Sorry to interrupt you, sir. How much time would you like for rebuttal, please? Four minutes. Yeah, I'll say four minutes, your honor. Very good. Thank you. Go ahead. I'll jump right in. I believe there are two critical issues. One is equitable tolling that the court granted in its COA grant. And then is the underlying substantive sickness claim. So given the fact that the court has to find, take jurisdiction of it, I'm going to address the equitable tolling. In my brief, in Mr. Massey's opening brief, I took the pain to search Lexis looking for cases where there was lost mail and extraordinary circumstances. And again, I believe under the standard, it's a two-pronged standard. One, did Mr. Massey act diligently? And the commonwealth can see there is he did act diligently. He timely pursued his direct appeal. He timely filed his PCRA petition. He timely appealed to the Pennsylvania Superior Courts. And then he timely filed an alibi. And he timely sought me out and retained me in February of 2016 when his EDPA deadline was running. What is the proof in the record that the mailing actually happened? I looked, I saw the email that was written to a person who seems to provide assistance in counsel's office and didn't see an affidavit, didn't see any statement from that person saying the mailing actually happened. So how can we say the district court clearly erred in its factual conclusion there was no proof that it was mailed? Because I think that's the first hurdle you need to overcome is demonstrate her honor clearly erred. The evidence is my word. I contacted, my secretary is my mom. She is retired and I keep her busy. And I immediately called that day. I called the courthouse on March 24, 2016. We accept all of that. I'm talking about the day of the mailing. I don't have an affidavit from her. I have my word that I spoke to her and I filed many things under penalty of perjury to establish the fact that here's the email I sent to my secretary. Here's the email I sent to Ron Wabi on March 10th. And I have attached part of the email was the cover letter I sent to the courthouse. I do not have an affidavit from my mother stating that she in fact mailed it. I simply that was coming through me saying I spoke to my agents, to my subordinate. She said she mailed it. I'm making affirmative. Is there someplace in the record where you made that representation to the district court that the assistant said she mailed it? I couldn't find it. I saw you're in your email to the Commonwealth two days later saying I mailed it. But I'm looking for something in the record. If there's nothing in the record, so be it. But is there anything in the record that says you made a representation to the trial judge in the district court that your agent reported to you it was mailed? Every pleading in the district court and before this court, I have said that it was mailed. Did I specifically say my mother mailed it? No. My exact words were that it was given to her. It was mailed. I saw that. She placed it in the mail. And that's how we got to the equitable tolling issue. I recognize that. I thought your best argument was that in your March 10th email to the A.D.A. when your time still hadn't run out, you said here's the petition. And and I mailed it two days ago meant to talk to you yesterday. So on March 10th, if there was a problem. Well, on March 10th, if your understanding wasn't that it had been mailed, you'd still have time to rectify that. Exactly. Your Honor, I again, every bit of information provided to the court. It's a preponderance standard that if you look at the cases, especially those I cited. And again, they're all pro se litigants who are mailing petitions or letters to reopen the petition. They provide circumstantial evidence that they mailed it. And I believe everything I provided to the court in my statements under penalty of perjury, that this, in fact, was placed in my 13 08 Plumdale court address on March 8th, 2016. I believe that's adequate evidence because counsel, how come there wasn't a certificate of service of simultaneous service on the Commonwealth? It's a time of the filing the presentation into the mailing. I looked for that, too. I was looking for the sort of service with the documents that would have been attached to the email directing the mailing to occur. And so my question is, why wasn't it done simultaneously as most most of the times you're serving simultaneously? That's a good question. It took me two days to realize that I needed to send an email to Ron Wabi. I mailed it on March 8th. On Thursday, March 10th, I said, you know what, I need to email this to Ron. I highlighted that in the email today. By the way, I mailed this two days ago. And but here it is. I understand. Let me ask you this on electronic filing. Western District of Pennsylvania had rules in effect in 2016 that required everybody was filing to be filers. I understand from the record that after it was discovered that the materials were not received timely and established in e-filing. But I'm asking this question not to be accusatory. I'm just trying to figure out how do we frame this if we have to generate an opinion? Right. And if a counsel is required to be an electronic filer and they're not, how is that not akin to the kind of garden variety neglect that is insufficient to be a basis to equitably told? I'm asking this not because I'm trying to be accusatory. We are going to someday have to generate some kind of opinion to explain, explain it. And so tell us how that's how do we explain that's not garden variety neglect? Well, we put it in a little box so it doesn't stand for something it shouldn't stand for. So go ahead. I would say the first question, that argument has never been raised. I mean, the district court didn't cite that argument. The Commonwealth has never cited that argument that the basis of Judge Linehan's attorney error finding is because of this local rule that you had to electronically file everything. And I should add, based on my experience, I found most of my 2254 positions in Philly and I have to mail everything there. So that's based on my practice. That's why I mailed it. And so, given the fact it wasn't raised in the lower courts, I would say the court, I mean, do you have the ability to consider that argument? The court can do what it wants to do. The second one, yes. If there was a local rule, that would be part of the analysis. But at the same time, I did take steps to, I did place it in the United States Postal Service possession. And I think that's the critical issue here is like, what happens when you have a mailing like that? And what is my duty, I guess is the thing. And that's just, if you look at Judge Linehan and the Commonwealth's argument or findings, is that there's some sort of duty. Once you place a form of constant pleading in the mail, a subsequent duty arises on that attorney's behalf to call the courthouse. And that might be true, but if it's true, I would have assumed the district courts and the Commonwealth would have cited the cases where that's true. What do we do with the case law of the 11th Circuit, Sandvik, that said delays in the mail is not a grounds for equitable tolling? What do we do with that case? And I mentioned that in my brief, Your Honor. There is a split amongst the court, but I also cited Fields, Washington, Chapman, where all, they were lost in the mail and all three of those pro se inmates received. That's different. There's a difference with the pro se inmates because they get the mailbox rule and they get other benefits because of their pro se status. But Sandvik is a representative. And again, we're trying to be mindful not to create some kind of circuit split and maybe there's a way to avoid that. But I was wondering if Sandvik, if you can tell us how we can get around Sandvik. Sandvik, it's not precedential. It's not part of this circuit. And again, I didn't brief Sandvik. I don't believe the Commonwealth approved Sandvik. So I cannot speak intelligently about Sandvik, Your Honor. I would simply say that I believe the pro se cases are relevant and they're relevant for this purpose. Because again, the reasoning with the Commonwealth and District Court is that I had some duty once I placed in the mail to call. And okay. But if you look at like Washington, Fields, and Chapman, in those cases, take Washington, for example, Washington mailed his, he placed it into the prison system. Which again, like prisoners, they have a reasonable expectation if they place something in the prison system mailing, it will get to the point where it should get. I'm a type of that same presumption. I placed in the mail. So he mailed his on April 7th. His input deadline didn't run until June 24th. Yet between April 7th and June 24th, Washington did nothing to interact with the court. He didn't write the court like, hey, by the way, did you receive this? He waited until a month after his input deadline had run. And when he realized on July 11th that your petition, his petition had not been served. So, again, in that case, if there is some sort of duty on litigants or even their attorneys to once you mail a time sensitive pleading, so then they have a subsequent duty to call the courthouse. I think the facts in Washington support what I did here. I called six days after the deadline, which I generally do. Like, most of my 2254s are out of the Eastern District and I'll mail it in and then I'll call and say, hey, can I have the case number so I can get to my client? And that's exactly what happened here, except when I called, they're like, we don't have it. And I nearly got the e-file, but the same thing in fields, there was a 50 day, 55 day interim between when fields mailed that letter to reopen on January 14th, 2006 to March 10th to his deadline. And then he waited another four months after that. And but he was still entitled to equitable form. So I understand those cases, I think, drive home the point that constitutes an extraordinary circumstance. And I believe that in the fact. As you mentioned, I served this on the Commonwealth, they received the 10 days before. The deadline, so, I mean, let's talk let's just talk about that's a good definition point. I totally understand the chronology. When you think of the word statute of limitations, what do you what what is the purpose of a statute of limitations to you? Dealing with so many untimely, I do a lot of post conviction and I clean up, I try to clean up a lot of untimeliness. And that's the first argument, you know, the Commonwealth makes a lot of times is, oh, we were prejudiced by this untimely filing. No, I didn't ask the question about prejudice. My question was purpose. What's the purpose of a statute of limitations? Not prejudice, but purpose. I'm assuming one part is to allow the court time. Again, when they enacted EDPA, you look at the chronology and the backstory of EDPA and what was happening before EDPA, a lot of these petitions were coming in years after the fact. But isn't that so that they make sure, isn't the purpose of a statute of limitations to make sure the alleged wrongdoer gets some finality that they're no longer going to have claims against them? Isn't that the purpose of it? So I gather, I'm sorry, counsel, can you repeat what you said? No, I agree with you. It expedites the process where if there is a constitutional violation, the federal courts can intervene sooner than later. And it allows the adversary, in this case, the Commonwealth to marshal its evidence to make sure they have some kind of finality in terms of when they're going to have accusations brought against them in this circumstance, an unconstitutional conviction from your point of view, right? Exactly. And so is your point, and Judge Greenaway's bringing it to your attention, the fact that the Commonwealth, the beneficiary, one of the beneficiaries of the statute of limitations got notice before the statute expired? Yes, that would be, yes, that is a significant fact. Yes, it's not timely filed with the court, but the Commonwealth timely received it. Moreover, it was the same claim that had been litigated in the state courts. It was the exhausted stricken claim regarding trial counsel's failure to request an imperfect self-defense manslaughter claim. It looks like my 11 minutes are up. Does anyone have any? You know, it's kind of like the Wizard of Oz. Disregard the man behind the curtain. Disregard the red light. Okay. Your time is not over. Okay. Any more questions? Mr. Cooley, I have a lot of questions for you. Please bring them. First of all, with regard to the mailing, am I correct that there was never a hearing before Judge Lenahan on the delay that occurred in this case? That's correct. There was no hearing. Was there a request for a hearing? Yes, in my initial, in the initial pleading, I requested an evidentiary hearing. Did you request a hearing specifically on the timeliness of the petition? It was all-encompassing in all, I mean, in terms of... I see. Yeah. Did you make an offer of proof before Judge Lenahan as to the mailing issue? Because as Judge Schwartz has pointed out, there is nothing in the record to close that final missing link here. You directed that it be mailed, but there's no affidavit that it was in fact mailed. There's nothing from the post office, no affidavit that says if you mail from 15239 to 15219 how many days it takes, as we've seen in other cases. So it's a big leap for this court to get to the place of assuming the mail was lost, that you mailed it and it got lost. So how do we get there? I mean, I... We take your word for it. Well, I think it's more than my word, Your Honor, quite frankly. I'm making a vermin under oath that this is what in fact happened. The fact that I didn't get it from my secretary, I'm trying to figure out the distinction between me averring what she said to me, and I'm giving something under oath, technically, that I could be charged criminally for filing a false affidavit. I just don't understand why in a life or death matter that loop would not be closed. But let's set this aside for a second and assume that this court is not going to evaluate this on a lost mail scenario. So I start with Rule 5 of the Federal Rules of Civil Procedure. Rule 5 says, first of all, all lawyers are to file electronically. It also says that a filing is filed when it's received in the clerk's office. Your filing got to the clerk's office six days late. So this court has to look to extraordinary circumstances that would qualify to prevent the lapse that's about to occur here. So tell me, what is extraordinary, external to this defendant, to this petitioner, that qualifies? Why should the court extend the deadline those six days? It's what I briefed in Mr. Matz's opening brief, Your Honor. It's the question presented in the COA grant is, does the United States Postal Service lost mail or failure to deliver constitute an extraordinary circumstance? I believe it does. But I'm saying, I am not convinced that this was mailed and that it was lost. I don't think the record supports that. So what other extraordinary circumstances might the court look to to give your client relief? Well, if you don't, in terms of extraordinary, if you don't think it's mailed, then there's no, you don't even get to the extraordinariness. If it's not mailed, then you're basically finding that all the pleadings I filed are simply false, which again, everybody's entitled to their opinion. But again, I filed those pleadings under penalty of perjury. And Rule 5 does say that, but also the Eastern District. I have filed 2254 petitions in the Eastern District electronically, and they immediately call me and say, Mr. Cooley, you can't file this electronically. You have to mail it. And so it's, I understand there's this rule, but based on what I presented to the court, my years as an attorney, my word to the court, based on the emails I've sent to Ron, you'd have to believe I sent something to Ron Robbie, like, hey, Ron, I mailed this, but I didn't mail it. I mean, there's a lot of, again, inferences. But the record, it's not that we're, the point is that when we're looking at the record and it says I mailed it, we know from the email two days earlier, someone else actually was supposed to be the person who mailed it. There's nothing in the record that says, other than what you just told us in the courtroom today, that you spoke to your agent and your agent said it was mailed. That record is, we don't have anything in the record in front of us, and that's our challenge, I think, that Judge Cain is, is among the things she's pointing out, is we have this deficit that we can't find. You can point us where in the record before the District Court that representation was made. That would be really helpful, but we couldn't find it. Well, the key here, the key thing, the way to think about this is there are two ways in which this opinion can be written, however it comes out, a not-presidential opinion or a presidential opinion. Either way, it's going to be widely read, both within and outside of the circuit, right? And our concern is, how will this be read with regard to future representations? Because what the appellate court can't get into is taking lawyers' words, you know, I mailed it, and it was mailed on this day, and I know I'm supposed to, you know, whatever. That is a principal concern of the entire panel, and so this really is an entreaty, to be honest, because it's that important an issue. No, and I respect the court's recognition of that, and I understand that there isn't this affidavit, but there's still, I believe, it's a preponderance standard, and if you look at the pro se cases, you have the same issues. You have to take the word in circumstantial evidence presented by the pro se litigant that he, in fact, put something in the mail. Right? Like, I put it in the mail. Well, how do we know you put it in the mail? Well, I have this was checked off here, this, I have this. So it's all circumstantial evidence going to the question of whether he, in fact, placed it in the mail, and under the preponderance standard, I believe I've satisfied that. I've given, under oath, I mean, pleading, saying, this is what happened. Here's the emails I've sent to Ron Wabi, and here's the actions I've taken thus far, and based on all those, I think there's sufficient evidence to say that this was, in fact, mailed. Why would I call the courthouse on March 24th, 2016? This is some, I mean, again, I understand the significance of it, but I believe that under the preponderance standard, I presented sufficient information, especially if you read Washington, Fields, Chapman, and the cases I cited. I know they're pro se inmates, but you still have to come to the conclusion that an inmate serving a criminal conviction is telling the truth. I'm an attorney who's been practicing for 15 years, and I'm telling the court, this is what happened. I pled those facts in the pleadings. I did not get an affidavit from my mother. I acknowledge that. That fact, I don't believe, should destroy Mr. Massey's equitable tolling claim, especially because the Strickland claim is, I think, meritorious. All right, let's move to the merits, unless my colleagues have more on this issue. Okay, very well. Let's assume for the purposes of the discussion, let's assume for a moment deficient performance. So let's focus on prejudice, okay? If we assume the superior court committed error in requiring a unanimous verdict as opposed to a holdout juror, which is the essence of the unreasonable application of Strickland, as I understand your point, what do we look to to support the notion that it's reasonably probable that at least one juror would have been a holdout for voluntary manslaughter? Well, that's a good question, Your Honor, and I briefed that. That was a significant chunk of the brief, and I walked through the court just the reasoning that one juror would go through. And again, you have to start with Jae Kwon's self-defense claim. So you'd have to find at least one juror to find that he had a subjective belief that his life was in danger. I believe the record establishes that, based on the testimony from everyone, the fact that he was robbed the day before, the fact that, you know, Beth Carter testified, Gabrielle Ford testified, Brittany Hull testified that, you know, Jae Kwon was a little shaken by this, and even Jae Kwon testified. So I think you would have that. I think that is in the record where it's reasonably probable one juror would find that he had a subjective belief. Okay. Secondly, you would find that one juror would find that subjective belief might be unreasonable. And, you know, I think the state and the district court put a lot of emphasis on the fact that the jury rejected his perfect self-defense claim, and they did. That's acknowledgement. But by rejecting the perfect self-defense claim doesn't mean the jury even got to the provocation and the duty to retreat issues. You could literally end the analysis right there. So, yes, Jae Kwon Massey had a subjective belief his life was in danger in that fourth and fatal encounter, and that it was unreasonable. Now, why is it unreasonable? Just the totality and, more importantly, what trial counsel argued during closing. And, again, I emphasize this in the brief is that, you know, trial counsel was doubly prejudicial. Not only did he not request the correct manslaughter charge, he then went into closing argument and repeatedly said, you know, a Jae Kwon acted stupidly. Unreasonably. Recklessly. He actually said irresponsible. He didn't say unreasonable. He said stupid and irresponsible. That's got nothing to do with whether it was unreasonable. It's got to do with whether his act was smart. So I'm not sure that those statements help you on this point. I would respectfully disagree. I think that goes toward the concept of reasonable. I mean, if it was reasonable, he wouldn't be acting irresponsible. It goes toward, again, he had the subjective belief, but those words are synonymous with unreasonable. He acted irresponsibly, right? I think it's in the semantics that hearing those words would tell a reasonable juror that, you know what, yeah, he had the subjective belief, but it was probably unreasonable. And you could end the analysis there. Assume that jury, you had a juror who made that conclusion. How do you get a, how can you say there would be a juror that would conclude he fulfilled his duty of retreat? When you evaluate, not in isolated events, but a continuum of several hours where he was in and out of the barbershop, he had access to telephones from different people, he had opportunities, he sought out rides. Robert came and he could have gotten a car with Robert. He could have called law enforcement. He had all of these opportunities over four hours or so, it appears from the record, to have retreated, which makes this case sort of different than some of the other cases in the, you know, that's in the sort of the jurisprudence of the Commonwealth of Pennsylvania. I'd like you to talk me through why that's those circumstances show he fulfilled his duty of retreat when he had all these opportunities to leave, make a phone call, et cetera, over a period of many hours. Yeah, the first, again, there's four encounters with the red SUV. And the first encounter, what did he do? He retreated into the barbershop. All right, he retreated. Okay, does he have to leave the neighborhood? I have not found any case law, and the Commonwealth has not cited any case law when in these circumstances, you literally have to leave a geographic area entirely to satisfy your duty of retreat. That's the argument that's being made here is that Jaquan Massey did not leave the north side of Pittsburgh and go to a completely different part of town. He retreated into a safe business. The first time. What happens again so after the first one what you do he calls William. Where's William Williams at the Pittsburgh airport. Okay. So again, he's walking, walking and he sees again, the red SUV. Now, mind you, the second time he saw the red SUV is after the Robert Wilds had provided this T shirt with the gun in it. So he had a firearm with him the second time. But what did he do. Treated to the barbershop. Right that he's retreated. So you're saying he went to the barbershop twice twice. Exactly. Twice. Third time, he leaves the barbershop looks around like okay the red SUV is again left the area. He left the area. All right, I did my job I retreated I'm assuming that they have left. All right, here comes the third and this is the third encounter I think where the Commonwealth provocation arguments made is that jquan sees the red SUV driving south on Perrysville Avenue, and it slows down. Okay, so again he has this subjective belief. Oh man, it's slowing down this isn't good so he does he does brandish the weapon. He does not pull the trigger. And there's a testimony by Patrick wilds and tying right about him. Patrick wilds can be at a ski mask. But you have to keep in mind this was directly where this third encounter supposedly happened you have jquan Massey in the middle of Perrysville Avenue, which is a busy intersection on the north side of Pittsburgh, right across from a fire department, donning a ski mask and holding a gun, trying to shoot it, and nobody sees it. Right, the only time that that was ever brought up was a trial, Patrick wilds and tying right never mentioned the ski mask, or the gun jamming narrative, and the gun mean the ski mask narrative is inconsistent between wilds and right. Right study never saw a black ski mask. So, but Massey's testimony, he did he brandish the weapon. Right, but under the provocation role and this is why I cited Samuel in highsmith in my brief is what was the intent of him doing that did he really have the intent to cause death or serious bodily injury. No, I wasn't asking about provocation council and folks on the retreat element. They're sort of intertwined. And so, that was getting to the retreat element regarding the third encounter. So again, the third encounter ends as quickly as it started so you know jquan brandishes his weapon in jquan's mind he's just saying please, I mean, just quit stalking me quit bothering me. And what happens. The red SUV retreat south on Perryville Avenue and jquan retreats east on bondo streets. And again, between the third and fourth encounter he makes two more phone calls. He runs into Patrick wilds, and he might again, but again there's a cooling off period. Right. And under the product under the duty to retreat. Again, he's retreated each time. First two into the barbershop, third time he, he retreats, east, the car retreat south. And I, again, I would ask the court, I mean how is the Commonwealth defining retreats. Do I literally have to leave a certain distance, or do I have to go to the south side of Pittsburgh and to the north side. I think what he's done satisfies the case law. And that's why again I started Highsmith and Samuel, and the fourth encounter is a critical encounter. And this is his testimony you know he sees the red SUV come up to bondo street and make a left on the bondo street he's on the east side they're going, they're going to make it left the west. And as they're making that turn he sees the front passenger with a gun. And his testimony is he fired twice thinking. All right. And he has he testified I better do something before it's too late. And so the question becomes, at that moment, when he saw that red SUV that fourth time under the state law. It's a subjective test did he have a completely safe avenue of retreat and I would ask the Commonwealth like how, if I see somebody have a firearm pointing at me and I'm standing on the sidewalk of a public street. Where do I go. I mean, so I think in that situation he did not have a completely safe avenue retreat. And that's the critical thing to focus on. And again, that's why I started Highsmith and Samuel is that those cases when we drive home. What he did here at least one juror could find that he retreated in the first three, and the third, the fourth and fatal encounter. He did not have a completely safe avenue of retreat. There's, there's, I'm sorry, go ahead. Is that in the, is that in the record, or are you drawing a conclusion, because I, you know, in the record. Excuse me. There's, there's, I think, Mr. Wilson George Wilson says he went to the fire department in the fire department, he banged on the door, it didn't open but I'm not clear from the record is that the only point of safe retreat at the point you are you saying there's no safe point of retreat, because there literally is no place or are you saying that there's no safe point of retreat, because a gun is pointed at him. I just want to be clear. The fourth encounter is the critical encounter and that's how I try to frame it in the opening brief, is that when he is right. He's on the sidewalk on bottle street. And here comes the red SUV making a left on the bond bill streets. And so the question is, and again this is a separate encounter from the third encounter so under the state law. Any sort of provocation has has diminished, and it's a clean slate. Okay, so now the aggressor is the folks in the red SUV. And yes, he does have a duty retreat I'm not saying he doesn't but the question becomes, if I'm standing on that public sidewalk on bond bill street. And I see somebody who I pretty firmly believe Robbie yesterday they don't want me to identify them, and now they're sticking. There's a gun out the window pointed directly at me. I mean that's the subjective belief that I have to shoot. So your point is, there is your point is this analysis should not include an assessment of safe havens, if you will, of where he could retreat. All of that analysis should go by the wayside because the only issue is a gun is being pointed at him now is that what your argument is there for this encounter. Yes, I mean, exactly, Your Honor, I don't think there's anything in Pennsylvania state law that would have required jaycon to specifically retreat to a quote unquote safe haven like the fire each time he retreated. So you're, so you're asking us to slice this episode into pieces. And you're focusing on the fourth point, and at that moment, there was no place to retreat, and you want us to ignore, essentially, all the other opportunities to retreat make a phone call call the police, etc. Is that your argument, you know, I'm not asking you to ignore anything, Your Honor, that's, that's how state laws applied and that's why I hammer home Samuel and highsmith. The provocation and duty retreat again, it's tied to the nexus requirement. They're tied to the fatal encounter here you have two separate encounters. So did he not have a subjective belief that his life was in danger until the fourth encounter. Is that your position that that's the only time that he had we'd have had such a belief. Are you saying that he had the belief that each of these four encounters. I'm saying under state law. If you look at the again Samuel and highsmith how they apply provocation duty retreat. The question is the fatal encounter. Again, Samuel is a critical case because in Samuel you have you have this back pattern you have you know brother comes over to help his sister, the sister is having is in a contentious relationship with her estranged husband. Okay, so strange husband comes into the living room berating the sister brother comes out brandishes a firearm. Okay, so you know what you might not want to do this to my sister. Words were spoken. Okay, but they both retreated. The estranged husband went to the bedroom. The brother went into the kitchen and put down his firearm. A few minutes later, the wife goes and looks for the estranged husband here he comes down the hallway with a with a firearm. And here comes the brother back with his firearm and shoots the estranged husband, a trial he took a bench trial he got hit with voluntary manslaughter in the bench, the judge who tried him, said, Well, I can't acquit you fully because you quote unquote provoked it because you bring us the fire. And the Supreme Court Pennsylvania Supreme Court said no that's no that's wrong because there was an encounter. Okay. But they looked at the intent and he looked at his action like did under the provocation statute in case law, there has to be intent to kill or cause serious bodily injury. And in this case, the court said, what he was doing he didn't have any intent to kill the estranged husband, or even seriously injured. He was just letting the estranged husband know that it might be in his best interest to leave, and like, it's not go. It's not escalate things, so there was no intent to cause death or serious bodily injury. So that's the first thing there was no provocation. But they also talked about, like, retreating, he retreated into the bed into the kitchen, according to the Commonwealth argument he should have left the, the, the apartment complex in its entirety, because now he provoked it and he could leave, or he could have retreated. But he did he just he went to he retreated to the kitchen and that was sufficient to cease that initial encounter. Once that initial encounter was over the provocation on any evidence of provocation was wiped clean. And then the second and fatal encounter where the estranged husband is now have a sawed off shotgun. And here comes the brother again. That is a separate encounter, where now the estranged husband is the aggressor, and the brother was simply acting in subjective belief that he had a defendant sister, and that's what I'm trying to emphasize here is I'm not asking the court to ignore anything. I'm simply asking the court. This is how state laws applied in Pennsylvania. And this is how they look at it. It is an episodic review in these types of cases. Are you sure it's not you're not supposed to look at the continuous course of events. Is that your position? Each one of the episodes are individually evaluated. I just want to make sure that that's your position. And for that position you are citing. Okay. What about the case law that says opportunity to make a phone call to call the police? There's some Commonwealth intermediate appellate courts that talk about opportunities to call the police. There were multiple opportunities. He had access to a phone, and he could have called the police to avoid this whole thing. What do we take from that? That case law. That case law again I did not cite that case law I did the Commonwealth I don't believe cited it in terms of having the duty to call the police. It's a factor that's considered by the courts and it's in the case law. If it's in the case law and you can cite to it, I would. I'm assuming they would have cited mentioned those in Highsmith and Samuel, but they didn't. I don't know because they could have. I mean, the sister. Highsmith and Samuel happened in somebody's house. Your client was on a public street. You know, there are some differences when you're at home, but we don't need to debate that. But there there was some differences. They also the time frame in Highsmith was different than the time frame here is hours. Now, I know your position is look at the fourth episode. Look at no others. The PCRA court found, I think, if it wasn't the district court that that your client is the only one that says that someone pointed a weapon at him from the SUV. Right. I mean, the jury obviously didn't accept that because they found intentional the intentional murder. And so I just have one other question on that. The trial court at the request of the Commonwealth gave an instruction to the jury that says go through the charges in sequence, which is, as I understand it, consistent with the model charge. What what evidence do we have that they would have ever progressed past the intentional homicide count that for which he was convicted? So you're asking had they been properly had they been given the perfect. So, yeah, why should we think even if the instructions the jury was instructed properly, what makes them think they'd ever reach it with the instruction that that the jury runs through the charges in a, you know, go with the first go with the highest charge and progress further. There was no objection to that charge. It seems consistent with permissible under the model charges. I was just wondering, from your point of view, how do we ignore this? The fact that the jury filed was instruct so instructed made the conclusion at the top charge. Why should we surmise that a properly instructed jury would have even reached that point under these circumstances? My first answer is, again, we're looking for one juror under Buck versus Davis. What? Okay. So, and again, what I started with is the example I started with, they could have simply come to the conclusion that. All right, yeah, but it was unreasonable. All right, don't do self defense. As the prosecutor in the case before us repeatedly mentioned, I mean, there's a specific intent if you aim a weapon and you strike somebody in a vital part of the organ, there's your specific intent. I mean, so literally, it could have taken it would have been like that. Right, because they didn't have the involvement, the imperfect self defense man thought of verdict. They stopped. Right. There's nothing. I think you're I think you're missing the point, if I may interrupt you for a moment. I do beg your pardon. I think the point of the question is, if the model jury instructions suggest a sequential process of deliberation, so that if you answer number one, X way, you stop. If you answer number one, Y way, you go to the next one. So that in the hypothetical you're being asked about, if they're what the instructions required, right, this sequential process. So assume for the moment the instruction error substantively, right, that it should have been given properly. It wasn't. Wouldn't the deliberations have ended after consideration of the murder charge. Hence, there would be no further deliberations. Hence, no opportunity to consider voluntary manslaughter. Thank you. That's what I'm trying to find. That's the essence of where we are with that question, please. And I would simply refer back to, you're assuming that there's, say you have one juror that doesn't really agree that it should be first degree murder, but because there is no other verdict. He's simply going to vote first degree murder. It's a Beck example, and I agree with that in Mr. Massey's opening brief. And so the court, I don't think, is disregarding. There's a real possibility that one juror could have done this. How do we get to reasonable probability? Based on all the facts that I presented that one juror could find that he had a subjective belief. It was unreasonable. He didn't provoke the force and fatal encounter, and he didn't violate the duty to retreat. That's how you get there. And again, with one juror, there is evidence in the record that I believe at least one juror, if given the opportunity to vote that, it's reasonably likely that that would have happened. Okay. So you're saying that if voluntary manslaughter were available, even if there were a sequential process for deliberation, the fact that voluntary manslaughter was there would have affected that potential juror's consideration on the matter. That's your point? Yes. Yes, Your Honor. Yes. We're assuming that all these jurors are like-minded and that they're all going to say, okay, then we all agree unanimously on this, and let's just go return this verdict. Jury deliberations don't happen like that. The questions are based on assumptions about juror behavior I don't think are realistic, because each juror goes in there with their own understandings of the evidence, and under Strickland, to get relief, I have to show that one juror could have looked at the record and said, you know what, he had a subjective belief. It was unreasonable, but I don't see premeditation. I mean, yes, he intentionally fired it, and then this gets back to the voluntary manslaughter issue versus involuntary manslaughter. He definitely intensely fired the gun. He said that. I fired him thinking I needed to defend myself, that he didn't violate the duty to retreat on that fourth and fatal encounter, and that he didn't provoke that fourth and fatal encounter. The third encounter doesn't even constitute provocation, because the way in which he brandished the weapon, there was some evidence in the record to discredit Patrick Wilde's and Tyreen Wright's testimony that he tried to pull the trigger. Tyreen Wright testified he didn't see this. He just saw that, according to his testimony, it was after the fact. He just saw how Jay Kwan was holding the gun. He just assumed it jammed, and Patrick Wilde said, oh, no, I saw it. But you have to keep in mind, Patrick Wilde also claimed that he saw Mr. Massey fire all five or six shots, which, quite frankly, is probably the most incredible thing he said, because if you look at two key witnesses, George Wilson and Officer Long, they're the only two APCs in the area where Jay Kwan said he fired twice. And there's three witnesses, two firefighters, and just a civilian witness that said they heard five or six shots. So again, Patrick Wilde and Tyreen Wright had credibility issues. And that's the point I'm trying to drive home is that, yes, the testimony was before the jury, but one juror could have said, you know what, they're making this up. They're succumbing to common law pressure to testify whatever way. And I don't believe that, hey, Mr. Massey premeditated this. Yes, he acted intentionally. I don't think he – he retreated each time. And now this fourth and fatal encounter, according to him, he says there's this gun facing him and it's open and public. And so I believe there are sufficient facts in the record where one juror, if given the opportunity, could have returned a manslaughter. All right. So let me ask you this question. At the beginning of your presentation, I think we jumped right into the issue of equitable tolling. But I think I heard you in your first sentence or your opening salvo to say something was a matter of first impression. But I didn't hear you finish the sentence. I believe the equitable tolling one – Oh, is that what it was? Okay. This circuit, my understanding is this court has never decided the issue that was presented in the COA order, whether the United States Postal Service has lost mail or if they lost the mail, would that constitute an extraordinary service? All right. I just wanted to make sure that we didn't miss anything there. Okay. Thank you. Mr. Cooley, on the duty to retreat, your client testified and he was questioned about that fact. He was asked why he didn't catch a ride when he had the opportunity to do so. And what was his response? If I remember correctly, again, according to his testimony, he could have left with Robert Wiles. Right. I don't remember the exact testimony. I believe he said it was too late. Can you orient us as to when that exchange occurred? At what point was he questioned about the ride and he said it was too late? Was it at the very end of the encounter or earlier on when he encountered the red SUV? Well, okay, so there's the first encounter. So, you know, he's hanging out with Beth Carter and then he runs into Brittany Ho and Gabrielle Ford. And then there's this first encounter and the first encounter prompts him to go into the barbershop. And at that point, one of the men from the red SUV walked up to the barbershop and, you know, stood in the doorway of the barbershop. And according to Mr. Massey, he could see a firearm on his head. So that's the first encounter. After that first encounter, according to his testimony, he called William again. And asked, you know, did you come pick me up? And William's at the airport. And so he called Robert Wiles at that point and Robert Wiles came and he could have left that. Yes, that is a credibility issue that is not good to his case. He could have left. When Robert Wiles came in a black SUV and dropped him and gave him this T-shirt. But mind you, he had that weapon before the second encounter, but he didn't use it. He didn't display it. He simply had it. And so after Robert Wiles comes, drives to this location in a black SUV, gets out of the car, hands this T-shirt to Mr. Massey, he then gets back in the car and leaves. So, yes, he could have left at that point, but he didn't. But keep in mind, though, shortly after that, he's still just walking in the neighborhood and he sees the red SUV parked again. And then nothing really happened the second encounter. Just the two men were staring at him, which made him concerned. So in that encounter, he retreats to the barbershop again. He didn't use the weapon. And again, he waits in the barbershop until the red SUV leaves. He looks out. He's like, okay, it's gone. I'm safe. And again, he has a right to be on the north side of Pittsburgh, let's be honest. Yes, he is uncomfortable, but at the same time, if I go somewhere and someone's trying to intimidate me, I'm like, why? I mean, you can look at it both ways. Why does he have to leave? Right. Over what period of time do all these encounters occur? The first encounter and then the shooting. Are we talking minutes? Hours? Half a day? Is it clear from the record? It's not really clear. And that's one of the things that's tough to determine from the record is timing. I mean, you hear the Commonwealth say, oh, this is an all day event. I find it hard to believe that this happened over a multi, several hour period. I think this is simply the men in the red SUV obviously had an issue with Mr. Massey and rightfully so. And again, there's evidence to corroborate that he was in fact robbed the day before based on Brittany Ho's testimony. I don't think anybody on this panel would suggest that Mr. Massey would not be permitted to return to the north side of Pittsburgh the day after he was robbed. I read very carefully what you presented in your reply brief and I read the analogy to the Walmart incident. I don't think we want to go there. No, I don't. But I made that point because I think it was relevant here. But the fact, I mean, I make that point because the state court brought it up. Like, he voluntarily went back the next day. That's almost, I mean, just tarnishing his character. Like, oh, my God, how stupid can he be? He went back to the same place. He was robbed. Okay. I don't again. I made my point in my reply brief and I honestly think it has validity, but he retreated each time. All right. Thank you. Are you good? Okay. Breathe deeply. All right. Thank you. Thank you. Thank you. All right. Council, we'll hear from you on rebuttal. Let's turn to appellee, please. Good morning, your honors. May it please the court, Alicia Fierfox on behalf of the appellees? Good morning. Good morning. Would you like me to begin with the equitable tolling issue? I'm not sure you'll be able to say much before a question comes out. I'll ask. I'll start. Do you want to start with equitable tolling? What do you understand the purpose of a statute of limitations today? My understanding of a statute of limitations is to provide both the defense and the Commonwealth or the respondents, the ability to gather all of their information, their witnesses, any materials they would need, and to be able to, like Mr. Williams and their family, just to give them some type of resolution at the end of everything so that they can move on. So here we have a circumstance where we have nothing refuting this from the Commonwealth. The Commonwealth was tendered the materials supporting the request for federal habeas relief before the statute of limitations expired. As a result, does that militate in favor of us tolling the statute of limitations because the Commonwealth had that kind of notice and the goals of a statute of limitations was thereby fulfilled? I understand what you're saying as far as the goal of the statute of limitations potentially being fulfilled since there was only a few days of time here. But I do believe that it's not even about how much of a delay that there was and whether or not Mr. Cooley can provide some sort of evidence that shows that this did, in fact, get into the mail. Where I take issue with this particular argument is mostly just with the fact that there was no follow-up. Every attorney has a duty to make sure that things get filed on time. And as the court has pointed out, there is a duty to not only to e-file, but also it's professionalism and the standard that we have to file things on time or ask for an extension. So, ultimately, I think that that is something that needs to be considered here as well, outside of just the policy concerns of whether or not the statute of limitations was filled. So you would say that the March 10th email is of little value? I do feel that way, Your Honor. Also, Ron Wabi is the Deputy District Attorney who handles federal habeas and PCRA here with the Allegheny County District Attorney's Office. The email had gone to him, but I was the attorney on this case, so I actually did not receive the notice of the filing until a few days later. It's our practice in our office not to consider something to be filed when we receive it via email. It's not until we are served by the U.S. Marshal or there is some sort of e-service that we consider it to be filed and ready to respond to. So how did you receive service? Don't answer that question yet. What in the record would reflect how service was effectuated on the Commonwealth? There was no certificate of service on the petition, so what in the record tells us how the Commonwealth was served other than that email? When Mr. Cooley e-filed the documents, that was when we received notice that the petition had in fact been filed. And I believe that was on March 24th, so after the due date. So your colleague never forwarded the file to you? The petition to you? It is typical in our office not to forward something like that on until it has been in fact filed with the appropriate clerk of court. And since in this case, Mr. Cooley's petition that he had forwarded to Mr. Wabi was not in fact filed with the appropriate court, he did not forward it on to me. We actually have a couple of cases that are like this right now where there was no actual service provided. Well, how would we know that it wasn't forwarded? Again, it would be what Mr. Cooley said. It would be my word. I mean, I have no problem supplementing the record with an affidavit from Mr. Wabi saying that he did not forward it on to me until after March 24th. But the point is, there's nothing in the record on this point, correct? Correct. Thank you. But I do think that it is important that the appellees point out that there's no extraordinary circumstance here. I don't think that we're refuting at all whether or not there was due diligence that was put forth as far as on Mr. Massey, on his behalf. He definitely diligently pursued all of these things coming up until this point. However, I think that this situation is more akin to attorney error or a miscalculation or negligence rather than a lost mail issue. In which case he would not be entitled to the equitable polling. And what's the negligence if it's not lost mail? Mr. Cooley not making sure that the document was received by the clerk of courts in an appropriate manner by the due date. I mean, the court offered several options. He could have either e-filed the document. He could have, I said he could call it confirmed. He also could have sent it at certified mail so that there would have been some sort of receipt upon delivery. I just feel like there are several other options that would have afforded him the ability to avail himself of equitable tolling. Would this case be different under the following circumstances? Mr. Cooley asked his assistant, probably, mom please, but he asked his assistant to e-file on March 8th. Ms. Cooley says, I have e-filed on March 8th. Same letter goes, same email goes out on the 10th. I e-filed it on March 8th. Is there a different result? I believe had Mr. Cooley e-filed the document that would have comported. No, no, no. I'm so sorry. I'm sorry to interrupt you. That's not what I said. I said, Mr. Cooley said in the email on the 10th that it was e-filed on the 8th. And all we have is that statement. And in fact, it wasn't e-filed. I feel like it would be similar to the current situation that we are still in for the simple fact that it doesn't change the fact that it was not appropriately filed with the right court. So it would not trigger for the Commonwealth a notification that a new case has been opened and filed with the clerk of court. All right. I think we are going to move to we're going to move on to some other questions. Would you agree with the following proposition that voluntary manslaughter reduces a murder conviction by negating the mens rea? I guess, to an extent, there still has to be intent, obviously, for the voluntary manslaughter. But I think that the subjective test kind of dives a little bit deeper into giving them a better background about the intent for the mens rea. So you'd agree, then, that finding the elements of murder satisfied doesn't preclude a verdict of voluntary manslaughter? I think in this case it does, mostly because there was a specific intent to kill in this instance as required by the statute, which I think makes it different than voluntary manslaughter. Because voluntary manslaughter obviously does not require the specific intent to kill, just that it was an intentional act in and of itself. So, I'm sorry, I thought you... So you don't think that it's inconsistent to have a finding of voluntary manslaughter and murder for the same homicide? I do think it would be inconsistent, based on the specific intent element. So if the jury made a finding of voluntary manslaughter, that would preclude a murder verdict? I think if they found that he was guilty of voluntary manslaughter, that would also infer that they did not find that he had specific intent. So I think that voluntary manslaughter could potentially preclude a finding for first-degree murder regarding the specific intent as required. My first issue, and I don't mean to dodge your question, so if I haven't fully answered it, please let me know. Don't worry, I promise to come back. Okay, I did want to first and foremost point out, since we are talking about the prejudice part of the merit section here, that the case that Mr. Cooley had cited, Buckley-Davis, I don't believe applies in this case. Most of what he had argued was that the Superior Court had applied the wrong standard and that all they had done was give lip service. And then he cited to Buckley-Davis. Applebees would like to point out that Buckley-Davis is a capital case, and it is involving certain things that are happening in the penalty phase. And all of the cases that Mr. Cooley has cited regarding this one juror, the mind of one juror being changed, all result, that is a standard for a capital case in the penalty stage, not in the guilt phase. Let's take a step back from that. I'm sorry. It's okay. Let's take a step back from that. When Strickland talks about a different result, you're not saying that the only quote-unquote different result is a unanimous acquittal, because that can't possibly be right. I mean, a mistrial would be a different result, no? Yes, it would be. So then I'm sorry I don't understand your point, because I get that, you know, maybe Buckley-Davis is in the capital context, but the important point is that when we think about different result, a different result isn't merely, can't only be, a unanimous verdict of, in this case, voluntary manslaughter or a unanimous verdict of acquittal. It could also be a mistrial. I don't disagree with the court on that assertion. Okay. So your only point about Buck is that's a capital context, but the argument remains the same. I think it actually, the standard in Buck, I think, actually is a little bit more stringent than the standard in Strickland, only for the sense that I'm not saying that it's an all-out acquittal that is required. But a mistrial doesn't necessarily preclude the Commonwealth from potentially retrying, depending on what the mistrial is for. And my, let me back up here for a second. I'm not saying that a mistrial isn't something different, but it is the Commonwealth's belief that the Superior Court properly evaluated the prejudice song, regardless of whether they use the standard for one juror, which I have only been able to find phrased in the penalty phase of the capital cases. I still don't believe that the Superior Court misapplied the prejudice standard because we can't say for sure whether one juror would have gone the way of voluntary manslaughter. But that's not the standard. It's not for sure. It's whether there's a reasonable probability, yeah? Yes. Perfect. Tell me why there's no reasonable probability that if properly charged, a juror would go for voluntary manslaughter. And I think what your adversary has pointed out is that a juror could say that it was, that he had a legitimate fear, but yet acted objectively unreasonably. That could be possible. However, I think that what we're doing when we look, when we're looking at it from that lens, is that we're using the benefit of hindsight to be able to go back and pick apart Mr. Geary trial counsel's, his reasonable strategic basis. The PCRA court had actually, they had adjudicated on the reasonable strategic basis and found that there was no deficient performance with Mr. Geary. But they also adjudicated on prejudice, right? They did not, I don't believe that they fully went through and adjudicated on prejudice, but I do think that they further went and supported the decision of Mr. Geary based on the fact that there was ample evidence in the record to support his strategy and not asking for voluntary manslaughter in that case. The PCRA court, excuse me, counsel, I just, unless I read this wrong, the PCRA court on appeal, the PCRA, original PCRA court relied on the strategic decision-making. The PCRA court on appeal, however, did a prejudice analysis and in a footnote said we did not express an opinion on counsel's strategic basis. Go back to first steps. Whose opinion are we reviewing? Are we reviewing the last reasoned opinion of the state court? If we are reviewing the last reasoned opinion of the state court, that opinion makes a finding on prejudice. If that is what we're reviewing, are we reviewing it at a deference to the prejudice decision? I'm sorry to take us off track, but I want to know which opinion you think we should be reviewing. I think that the fact that both of the opinions that pick a separate prong of Strickland to deny relief is important in this situation because it is so different. I don't think that there's, I'm sorry, I might have misspoke. So just to be clear, I was referring as a PCRA court as the trial court level and then the superior court, when they looked at the PCRA court's ruling, that is when they did the prejudice standard. So I'm sorry if I misspoke and made that confusing. But they did undergo the prejudice standard at the superior court level when reviewing the PCRA court's decision. Do we owe it at the deference? I believe you do. And then on that circumstance, then we can only disturb it if it's an unreasonable application of Strickland. Correct. Right? So we have to, superimposing on Judge Greenaway's question, how is it that you can argue this was, it was not an unreasonable application of Strickland to conclude there was a reasonable probability that at least one juror would have struck a different balance or different consideration? Now you talked to us about the one juror issue and there's a case called Wiggins I'll ask you about in a second. But taking the standard overview we have to apply and focusing on what Judge Greenaway was asking about concerning the reasonable probability that the outcome could be different, give us your best argument as why a properly instructed jury wouldn't have reached a different conclusion. Put differently, why is the prejudice decision entitled to deference without question? I believe that's because they did follow the parameters of Strickland within their analysis of the prejudice argument. I think that when the Superior Court started discussing the prejudice of it, they initially started with the provocation and they found that the court could not have found for voluntary manslaughter and the self-defense claim because not only did the appellant here provoke the infant by pointing the gun, but there's also, he never retreated from the area. And I know that opposing counsel talked quite a bit about whether or not he had a duty to retreat, but I would like to keep the court's focus in mind here that this area where these instances were going on was only a few block radius. We're not asking that he would leave the entire north side, but he didn't remove himself from the couple blocks where these encounters had occurred. Help me on that point. There's evidence in the record of him hiding in somebody's house, of him hiding behind bushes. Whether you look at this as a continuum or you look at this as your adversary has asked us to look at it, there are several instances in which Mr. Massey retreated. So help me with your conclusion that he never retreated. Well, specifically between the third and the fourth encounters with the SUV where the firearm was brandished by Mr. Massey versus the last encounter where the fatal shooting occurred. I don't see anywhere in the record that says that there was a significant amount of time that occurred between the third provocation and the fourth encounter. Is that a requirement under our law? A significant amount of time passing? I don't know that that is a requirement under the law, but I know that that is a part of the analysis when deciding whether or not he in fact retreated or whether or not he provoked because Mr. Cooley was suggesting that since Mr. Massey had not displayed the firearm anymore after that third provocation, and that since he had then fled to go hide behind bushes and the SUV continued to drive off because he shot while the car was driving in the opposite direction, that because they had separated at that point that they had both retreated and so that initial provocation no longer was in play. But it is my argument that there is nothing that supports Mr. Massey's contention that there was a firearm pointed at him. There were several witnesses that were asked about it and nobody could corroborate what Mr. Massey said about somebody in the passenger seat pointing a firearm at him. And taking that for what it is, which is just a bold assertion by a defendant who obviously has some skin in the game here, it's very difficult for the Commonwealth to believe that he was only reacting to what was happening from the car. There's nothing that supports that contention whatsoever. So it's my belief that the pointing of the firearm at the SUV as it was driving away and then the car looping back around and then supposedly making these gestures to Mr. Massey, I think that that's a continuation of the same event. I don't think that there was enough of a retreat that happened there where we can say that he did not provoke that fourth encounter. I cannot seem to find any amount of time. We're trying to discern how much time this whole event had actually transpired. But even between the third and the fourth instance, I don't believe that there was that much time. Whether there is or not, help me on this. Between what you've just enunciated as the third and fourth encounters, you said Mr. Massey shot or tried to shoot as the SUV was going in the opposite direction. So the fatality that's come about hasn't happened yet. So at that point in time, doesn't the record reflect that Mr. Massey tried to hide at that point? And if that is so, why isn't that retreat? I think at that point, I don't know that I would necessarily classify that as retreat. You don't think hiding is retreat? I think Mr. Massey realized that what he had done was not necessarily the smartest thing and then tried to seek cover as a result. I don't know that he was necessarily retreating in order to... I don't think that him retreating and hiding on the same street in which the third encounter happened is considered a retreat. I do not. Because it's inconsistent with what in the law, please? I don't have anything in particular to cite you right at this moment. Where I was going with that is that he said that he was hiding behind bushes. But there was a lot of testimony on the record about how high these bushes were, whether or not he was able to be seen, whether or not it could completely cover him. And there was also some testimony about the fact that he took the high ground. So the Commonwealth had introduced some evidence on the record that he could have potentially decided to go up on that area to hide. But what we are saying is that he could have potentially gone up there to get a better angle when the vehicle came back around. So I don't necessarily believe that he was in fact hiding behind a small bush that supposedly had been trimmed and had no shrubbery because it was in the middle of November. I thought... I could be wrong about the facts, but I thought that he went to the bushes and then when the bushes were not sufficient, he tried to go into the house. Am I wrong about that? My understanding, Your Honor, is that he went to the house first, tried to get in. They would not let him in, so then he tried to hide on the porch. When they found out that he was on the porch, the homeowner turned the light on and told him that he had to leave. And so then at that point, he went around to the side of the house and was hiding behind the bushes. So none of that, what you've just recited to us, none of that constitutes retreat in your view. Trying to hide in the house, hide in the porch, go around back, and hide behind bushes on the side of the house. I don't know that that was... He tried to go to a house that he knew one person lived there. There were multiple places where he could have gone, and I understand, Your Honor, saying he did choose this house. But when that house was no longer available to him, that was when he decided to try to shoot back at the SUV whenever it came back around. Do you agree with your adversary that we should look at these as individual events, not a continuum of events, to determine whether the jury had a basis to reject retreat? I think that without knowing the actual timeframe from when one thing transpired, because there was some testimony that this may have only taken place over an hour period. I believe it was Mr. Wilds or Mr. Wright had testified that they got home from school around five o'clock and that they had gone up to the barbershop. And that was when the first encounter with Mr. Massey and Mr. Wilds and Mr. Wright occurred. So if we're to believe that timeframe, then all of this transpired within an hour's time period. And so if that's the case, I think this is a big continuation. I think that they were playing a game of cat and mouse with each other over that period of time, and we ended up seeing the result of that. So you view this as a continuum of events? And at some point, from your point of view, he becomes a provoker? Given the testimony about the time period, yes, I do. I don't think that there was enough time to have been able to have eliminated the provocation that Mr. Massey had initiated on that third encounter. If this is a continuum, isn't the provocateur, if you will, the folks in the red SUV throughout? If it's a continuum, right, they robbed him and they throughout the continuum have sought out him. He hasn't sought out them. Your Honor, I would just like to say that there is nothing in the record that actually says that the occupants of the red SUV were in fact the same people that had robbed Mr. Massey the day before. All of the records can clearly show is that Mr. Massey recognized the SUV as the vehicle that drove past him after he was robbed the night before. And when he was asked about the drivers and the passengers who got out of the vehicle and came into the barbershop the first or second encounter, he was asked whether or not he saw their faces and if they were the same people that robbed him the night before. And he said he never looked at their faces. He kept his head down. So there is nothing on the record that indicates that these are in fact the same men. And this is an assumption that Mr. Massey is working off of, which I think plays into the fear element that Mr. Geary was arguing for the involuntary manslaughter. Does it really matter, counsel? The night is coming. He's on foot. He's being pursued by two people in an automobile, and there's some testimony that he believes they are armed. I think it's... I'm sorry, Your Honor. He's at a bit of a disadvantage, isn't he? It doesn't really matter if they're the robbers or not. I think there was nothing that necessarily indicated that his life was in danger, even at the barbershop. I will concede that they were taunting Mr. Massey by coming into the barbershop and refusing to leave. But even at that juncture, the barbershop owner had told the police. And Mr. Massey still chose to leave the barbershop at that time, even though the police were being notified about the instance that was happening. On the... I'd like to just go back to the Buck v. Davis point for a moment. Okay. And I wanted to ask you if you're familiar with a case called Wiggins v. Smith out of the United States Supreme Court in 2003. I am not, Your Honor. Do you know that case? I do not, Your Honor. The reason why I bring it up is it looks like the Supreme Court, and I'd have to go back and see whether it was a capital case or not, said that when considering a reasonable probability, you're considering whether at least one juror would have struck a different balance. So the one juror nomenclature seems to at least be in Supreme Court precedent when evaluating the reasonable probability. That's why I wanted to know if you were familiar with it. Thank you for saying. I'm not familiar with Wiggins, but the cases that Mr. Cooley had cited to you in his brief to support the one juror standard, I believe there was Gemeron v. Horn or something to that effect. It also was a capital case only dealing with issues in the penalty phase. So I just want to make sure that the court understood that we were trying to make it a point to differentiate the two standards. Very helpful. Thank you. Okay. Do you have anything? Okay. Thank you so much, counsel. Thank you for this opportunity, Your Honor. Absolutely. We'll hear from you on rebuttal, sir. Thank you, Your Honor. Just a couple points. Now, there's been a lot made of whether I made a declarative statement to the Commonwealth at some point about, you know, what happened to the mailing. And if you look at the Joint Appendix on page 1211, you know, when I emailed Ron Wadley the e-filed petition on March 24th, 2016, I emailed him. I said, look, this is what happened. And this is my exact quote to him. Quote, I talked with my secretary. She definitely mailed it, and it was never returned to my Pittsburgh office as undelivered. So who knows where the package is at this point. So I put something in the record stating that this, there was definite communication between me, my secretary, and I conveyed that to the Commonwealth, that this is what happened. And so I wanted to address that. Buck v. Davis, I understand what counsel is saying. It's a capital case, but it's, Justice Alito wrote the opinion. And it is. It's a reasonable probability with one juror. And Your Honor mentioned Wiggins. I'm quite familiar with Wiggins. I did capital cases for years. So Wiggins is a significant case. And you're right. It's one juror. And I should mind, there's a couple Brady cases. And Brady used the same reasonable probability of a different outcome where, I'm going to say Justice Keegan and the Turner, United States v. Turner case. I think there's an opinion there where they say under Brady, it's the same standard, one juror. Had this evidence been disclosed, would this new evidence have changed the assessment of this one juror? In terms of, I think the Commonwealth showed that what I've been arguing is that Mr. Massey retreated. And the fact that the Commonwealth is simply refusing to admit that hiding and doing all these things does not constitute retreat shows the Commonwealth that this is a bad fact for them. And that one juror could find that he did, in fact, retreat each time. You know, counsel said that multiple people testified that they didn't see a gun from the red SUV. I don't, I just, when she made that comment, I pulled up the Commonwealth brief and prior briefs. I don't know which witness she's talking about. But there's substantial evidence in the record to say that those folks in the red SUV, in fact, fired at Jake Warren. And again, I refer to court to the two, Lieutenant Hunt, who's a firefighter, and then Officer Baltes, who's a firefighter. And then all three of those witnesses said they heard five to six gunshots. But if you could, could you direct our attention to where in the record someone other than Mr. Massey said that there was weapons were fired from the SUV? You're talking about visually see somebody shooting or hear? Correct. I'm aware of the testimony referred to in terms of people hearing other shots. But the only testimony I recall about anyone seeing a firearm coming out of the SUV came from Mr. Massey. Is your representation there other people who also saw that or are you relying on the fact that people heard more shots? Yeah, that's my position is Mr. Massey saw what he saw. And again, there was no witnesses around who would say otherwise. The way the Commonwealth pitched it was that, oh, there were witnesses who saw the shooting and they definitely said that this didn't happen. That's simply not true. The way that the shooting went down, it was quick. You know, they'd make the left on the Bondo streets and Mr. Massey sees this shots of fire. So it happens. Boom, boom. And so, no, there are no other witnesses who saw the shooting. But at the same time, that doesn't mean with the absence of evidence doesn't equal evidence of absence that applies here. Right. So there the circumstantial evidence strongly suggests that those folks in the red SUV fired shots at Jake one. And again, I would simply point to George Wilson. Who said that the two distinct. There was gunfire from two distinct directions. Officer Wilson, who did the scene collection, identified only two secs in that location where Jake was standing and Jake said, I fired twice. And so the question is, if you have three credible firefighters who probably testified that there were five or six shots in a civilian confirmed that the testimony of two firefighters. That is strong evidence to believe that somebody else was firing. And I would just yeah, I just want to clear that up and. Again, with the equitable tooling. Obviously, you learn from different cases. So moving forward, I will get an affidavit. But I think I've provided sufficient evidence in the record where the courts in the district court could have drawn an influence on the preponderance standard. Like in the Commonwealth's brief, they're like, Mr. Cooley didn't present irrefutable evidence that this, in fact, was mailed. Well, that that simply isn't the standard. It's a preponderance in every evidentiary standard is based on using inferences from circumstantial evidence. And I agree, I did not get an affidavit from my mother. But I presented sufficient facts in the record. And if you rely on the pro se cases, the inferences and the deference that they're given in the circumstantial evidence they presented. As to them mailing something from the prison, I think I've met that standard to say, you know what, Mr. Cooley can't definitively or irrefutably prove that this was placed in the mail. But under the preponderance standard, we believe it's more likely than not that he did. Because look at my actions. Why would I mail Ron a petition that I never mailed? Why would I then call the courthouse on March 24th and follow up? And again, Chapman is a critical case because Chapman focuses on that. And Chapman says, you know, somebody who mailed something generally wouldn't do this. So that's, again, circumstantial evidence to establish that, yes, I mailed it. Could I have presented more evidence? Absolutely. But that's the question. The question is, under the standard, is there sufficient evidence in the record? And I think there is. And I think once you make that finding that it was placed in the mail, then you get to the extraordinary circumstance. So, Mr. Coley, should this court remand this to the district court so that these matters can be flushed out and a determination made on whether you, in fact, mailed it? Your Honor, you have a great mind to think alike. And, you know, the Commonwealth mentioned that they would supplement the record with this, I mean, process in place about not accepting certain things. If Your Honor would be so willing, I would absolutely, I would bring my mom down to testify in person and we could flush that out because his claim has merit. And if you're going to deny him because it's six days late, even though the Commonwealth received service and I did A, B, and C, I simply didn't get an affidavit from my mother. I'm willing to do that because I believe in Jaquan's case. I believe he got ineffective assistance from counsel. And I believe the prosecutor in this case knew that quite well during the charge conference. And so, yes, I would, if you would be so willing, to remand and to, it would be a short hearing. Like, this is what happened. Take the testimony, make findings, and, but that thing was absolutely mailed. I will go to my grave when it was mailed. All right. Thank you so much, counsel. Thanks to both counsel for spirited arguments and we'll take the matter under advisement and we'll adjourn for the day. Thank you.